**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

_____

No. 97-40010
Summary Calendar
_____


W.G. PETTIGREW COMPANY
and
PETTIGREW DISTRIBUTING COMPANY, INCORPORATED,

Plaintiffs-Appellants,

VERSUS

BORDEN, INC.,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Southern District of Texas
(G-95-CV-147)
_____

September 8, 1997

Before JONES, SMITH, and STEWART, Circuit Judges.

JERRY E. SMITH, Circuit Judge:[*]


W.G. Pettigrew Distributing Company ("WG") and Pettigrew
Distributing Company, Inc. ("PDI"), appeal a summary judgment in
their lawsuit asserting breach of contract, predatory pricing, and
various state law tort claims against Borden, Inc. ("Borden").

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion
should not be published and is not precedent except under the limited circumstances
set forth in 5TH CIR. R. 47.5.4.

Finding no error, we affirm.

                                    I.

Beginning in 1941 and continuing until 1995, WG worked as an independent distributor of milk products for Borden, serving customers in Brazoria, Matagorda, and Galveston Counties, Texas. Sometime during the mid-1940's, W.G. Pettigrew hired his brother, Delmar, to service some of his delivery routes and, in 1988, Delmar incorporated his business as PDI. Although Borden does not dispute that it was aware of Delmar's servicing some of WG's routes, it denies that any contractual relationship existed between Borden and either Delmar or PDI. Rather, Borden contends that at all times Delmar (or PDI) was an employee or independent contractor of WG's and that Borden's distributorship relationship was with WG only.

Although, prior to 1973, no written documents governed the relationship between WG and Borden, the parties do not dispute the general terms of the engagement. WG, as did the other independent distributors, purchased milk products from Borden at the "dock" prices set by Borden and would sell and deliver the products to customers in areas outlying Houston. Each distributor was free to set its own resale prices. Borden maintained records designating routes by number, but it did not permit exclusive territorial assignments. In addition to purchasing at dock prices, WG and the other distributors made deliveries to customers who dealt directly with Borden and received appropriate "hauling charges" therefor.

2

From time to time, the dock prices fluctuated depending upon the cost of raw milk and other economic factors, and WG's accounts were credited varying amounts for "returns" (e.g., broken bottles, leakages, and spoiled milk). Borden offered WG and the other distributors periodic rebates and allowances to keep Borden products competitive.

In May 1973, Borden sent a memorandum to WG and the other distributors[1] outlining new Borden policies effected in the wake of the Texas Railroad Commission's promulgation of rules on inter-county sales and transactions. Among other things, the memorandum states that Borden would (1) eliminate hauling charges associated with its direct-deal customers and instead have the distributors themselves conduct business directly with such customers and (2) continue to accept returns for defective merchandise, spoils, and leakers and to pay an advertising and display allowance to participating distributors. The memorandum was never signed or executed in any manner by WG, nor does it contain any contract terms governing its duration, modification, or enforcement.

Following the distribution of the memorandum, Borden and WG continued to operate much as they had in the previous thirty-two years. Dock prices continued to vary, as did the amount of financial assistance and credits provided WG and the other distributors. Nonetheless, WG (and Delmar) continued to distribute

---

[1] PDI was not provided a copy because, according to Borden, Delmar was an employee of WG's.

Borden products pursuant to the promulgated dock prices and other financial policies.

Beginning in 1988, Borden began to re-institute its practice of dealing directly with certain customers and paying hauling fees to distributors who delivered to such customers. As a result, in 1991 Borden began competing against WG and PDI for retail and grocery store accounts and began reducing the various credits and adjustments provided previously.

WG and PDI continued to operate under this arrangement until late 1994, when Borden advised them that it intended to terminate virtually all of the financial assistance. Borden also announced that hauling fees would be standardized at $.50 per case for "drop shipments" and $1.60 per case for full service shipments. These new arrangements did not affect the distributors' abilities to negotiate resale prices with any customers to whom they sold directly.

WG objected to these proposed changes and asked Borden to purchase its entire distributorship business or its haul accounts only. Borden declined this offer but agreed to provide financial assistance to WG in the form of a flat payment of $3,800 per week plus an allowance of one percent of gross sales for returned merchandise. The flat payment was made retroactive to July 1994, whereas the returned merchandise credit was made retroactive to October 1994. WG accepted this offer, which was memorialized in a

4

November 11, 1994, letter agreement from Borden to WG.[1]

WG operated under this letter agreement until notifying Borden in December 1994 of its intention to terminate the distributorship effective January 15, 1995. According to WG, as a result of the direct competition with Borden and the various financial changes made by Borden, the distributorship had become unprofitable. Subsequent to WG's notice of termination, Delmar contacted Borden and asked that PDI be designated an independent distributor of Borden's. Borden declined, and PDI became a distributor for Land O' Pines, a Borden competitor, within days of WG's effective date of termination.

## II.

WG and PDI filed the instant action in March 1995 alleging breach of contract, predatory pricing, and various state law torts. Upon motion from Borden, the district court granted summary judgment on all claims presented to it and not dismissed voluntarily by WG and PDI. On appeal, the plaintiffs present only the breach of contract issue.

## III.

We review a grant of summary judgment *de novo*. *See Hanks v.*

---

[1] WG in fact proposed on November 15, 1994, an amendment to the returned merchandise credit, but Borden refused this amendment. The parties continued operating pursuant to the terms of the November 11 letter.

*Transcontinental Gas Pipe Line Corp.*, 953 F.2d 996, 997 (5th Cir. 1992). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c).

WG and PDI allege that the 1973 memo created a contractual distributorship relationship with Borden and that the memo's terms governed the relationship. According to the plaintiffs, Borden breached this contract by, among other things, discontinuing certain payments to the distributors, reinstituting its practice of negotiating directly with certain customers and paying hauling fees only to distributors who serviced these customers, and reducing credits for returned merchandise and spoilage.

Assuming *arguendo* that the 1973 memo created some type of contractual relationship between Borden and WG and PDI, we agree with Borden that any such contract was terminable at will.[3] "A contract that contemplates continuing performance and is indefinite in duration can be terminated at the will of either party."[4]

---

[3] The parties dispute whether PDI (or Delmar) was a distributor of Borden's or merely an employee or independent contractor of WG's. Although there is conflicting evidence on this point, we need not resolve this conflict to dispose of this case. Rather, because it does not affect our ultimate disposition, we assume *arguendo* that PDI was a distributors of Borden's, subject to the same contractual agreement that governed the WG-Borden relationship.

[4] *Farah v. Mafrige & Kormanik, P.C.*, 927 S.W.2d 663, 678 (Tex. App.SSHouston 1996, no writ) (citing *Clear Lake City Water Auth. v. Clear Lake Util. Co.*, 549

(continued...)

It is undisputed that the 1973 memo contains no term of duration, nor do WG and PDI allege that anyone at Borden ever indicated to them orally that their distributorships would exist for any specified period of time.[5] WG and PDI aver in their affidavits, however, that it was their belief that a Borden distributor could not be terminated unless Borden had a good reason to do so. According to the plaintiffs, this belief was based upon their observationsSSgleaned during their tenure as Borden distributorsSSthat the only distributors who were terminated were those with drinking or financial problems. WG and PDI also proffer the testimony of Darrell Joslin, the former comptroller for Borden's Houston and Conroe facilities, who indicates that he was not aware of any distributorships' having been terminated without reason. Joslin also testified that he was not aware of any restrictions on Borden's ability to terminate a distributorship, but believed that it was Borden's practice not to do so without cause.

This evidence is insufficient to create a fact issue concerning the at-will nature of the distributorship contract. WG and PDI do not point to any oral or written communications that alter the presumptive at-will nature of a contract of indefinite

---

[4](...continued)
S.W.2d 385, 390 (Tex. 1977)); TEX. BUS. & COMM. CODE ANN. § 2.309(b) (West 1994).

[5] *See, e.g.*, *Morgan v. Jack Brown Cleaners, Inc.*, 764 S.W.2d 825, 826 (Tex. App.SSAustin 1989, writ denied) (noting that the parties to an at-will contract may modify the contract period by orally vitiating its at-will nature.

duration contemplating continuing performance. Rather, they rely solely upon their subjective beliefs, informed by their observations of the course of dealing between the parties. Subjective manifestations of intent alone are not suitable indicia of contract interpretation. *See, e.g.*, *Stern v. Wonzer*, 846 S.W.2d 939, 944 (Tex. App.SSHouston [1st Dist.] 1993, no writ.)

As an at-will contract, the distributorship could be modified by either party as a condition to the continuation of the relationship. *See Hathaway v. General Mills, Inc.*, 711 S.W.2d 227, 229 (Tex. 1986). In general, when a party to an at-will contract notifies the other of changes in the contract terms, the other must either accept the terms or terminate the contract. *See id.* If the party continues to perform under the contract with knowledge of the changes made by the other party, the former is deemed, as a matter of law, to have accepted the changes. *See id.*

It is uncontested that during the course of their entire, longstanding relationship with Borden, WG and PDI had notice of all changes to the distributorship. An various times during the relationship, Borden changed, among other things, the dock prices, the return policies, and its hauling fee policies. Each time, WG and PDI had notice of such changes and continued to deliver Borden products pursuant to the modifications.

The same is true of each of the post-1973 changes that WG and PDI allege constitute contract breaches: The plaintiffs were aware

of each change and continued their employment consistent with the changes. Given notice of the changes, the continued performance of WG and PDI constituted acceptance of the new contract terms as a matter of law. These accepted changes to the at-will distributorship agreement thereby became incorporated into the contract and thus do not give rise to any breach.

AFFIRMED.